AAFCO HEATING AND AIR CONDITIONING COMPANY *v.* NORTHWEST PUBLICATIONS, INC.

[No. 3-1073A133. Filed December 30, 1974. Rehearing denied January 31, 1975. Transfer denied September 19, 1975.]

*William K. Bennett, Bennett, Boehning & Poynter,* of Lafayette, *David J. Albanese, Albanese, Hoehne & Coffaro,* of Cincinnati, Ohio, for appellant.

*Gerald K. Hrebec, Fred M. Cuppy, Thomas, Burke, Dyerly & Cuppy,* of Gary, for appellee.

STATON, J.—The Gary Post Tribune published a series of ten articles concerning an electrical fire at the home of Mrs. Matilda Collins which caused the death of her two small grandchildren. Aafco Heating and Air Conditioning Company had installed a furnace in the home of Mrs. Collins three weeks before the fire on October 21, 1970. The articles reported that no permit had been obtained by Aafco before making the installation and that one fire official observed that "a heavy duty blower on the furnace may have caused an overload in the electrical service" which ignited the fire. A formal complaint against Aafco was filed with the Gary Contractors' Licensing Board which resulted in Aafco's suspension.

Aafco filed a libel complaint for $250,000.00 in actual damages and $500,000.00 in punitive damages. Northwest Publications, Inc., publishers of the Gary Post Tribune, filed its answer which relied on the defensive grounds of truth and qualified constitutional privilege. Later, Northwest's motion for summary judgment was sustained by the trial court. Aafco's appeal from this summary judgment presents the following questions for our review:

1. Does the qualified constitutional privilege announced in *New York Times* v. *Sullivan* and *Rosenbloom* v. *Metromedia, Inc.* apply to an alleged libel of a private individual in Indiana when the published statements relate to an issue of general and public concern?
2. Is there a genuine issue of material fact upon the question of privilege?

Our review examines the development of privilege as a defense and its First Amendment dimensions. *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, gives the states the option of defining the standards of constitutional privilege for "private individuals." Our opinion rejects the simple negligence standard suggested in *Gertz* v. *Robert Welch, Inc., supra.* We

redefine the Indiana libel standard for the private individual. We conclude that a qualified constitutional privilege does apply to a private individual in Indiana and that there was no genuine issue of material fact upon the question of privilege. We affirm the trial court's summary judgment.

## I.

### *Privilege*

Until a decade ago, privilege had no First Amendment dimensions. The common law development of defamation had been left to the several states. *Times Film Corp.* v. *City of Chicago* (1961), 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403; *Beauharnais* v. *Illinois* (1952), 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919; *Chaplinsky* v. *New Hampshire* (1941), 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031. For example, a state legislator in Indiana is immune from liability even if he publishes defamatory material with an improper motive and with knowledge of its falsity (absolute privilege). IND. CONST., Art. 4, § 8. A similar absolute privilege attaches to judges, attorneys, parties and witnesses in connection with a judicial proceeding. *See, e.g., Griffith* v. *Slinkard* (1896), 146 Ind. 117, 44 N.E. 1001. The dissemination of news by the communications media has traditionally been safeguarded by two qualified or conditional privileges which may be pleaded as affirmative defenses in a libel action:

1. The privilege of "fair comment" (limited to opinions on public officials and their conduct—not applicable to private individuals or newsworthy events) and
2. The privilege attached to the reporting of public proceedings.

*See Henderson* v. *Evansville Press, Inc.* (1957), 127 Ind. App. 592, 142 N.E.2d 920; 18 I.L.E. *Libel & Slander* § 61, at 474-75. *See generally* Note, *Fair Comment*, 62 HARV. L. REV. 1207 (1949).

In most states, the law of defamation regarding privileged communications follows a similar pattern. *RESTATEMENT*

OF TORTS §§ 585-92 (1938). But, prior to the landmark decision in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, qualified privileges for the protection of the mass media were limited by numerous restrictions and were often narrowly construed. While there would appear to be no Indiana authority to explicate the scope of these privileges, the weight of authority traditionally recognized only statements of opinion as privileged; false statements of fact were never privileged. *See Post Publishing Co. v. Hallam* (6th Cir. 1893), 59 F. 530; Noel, *Defamation of Public Officers and Candidates*, 49 COLUM. L. REV. 875 (1949). Even in cases where the privilege was applicable, the publisher-defendant could suffer the loss of his defense of privilege if the libeled plaintiff could adduce evidence of either negligence or ill will. RESTATEMENT OF TORTS § 606(c) (1938). Moreover, many courts limited the privilege of fair comment to the discussion of public events or the conduct of public officials; there was no privilege accorded the media to comment on matters merely because they were newsworthy. *See, e.g., Broking v. Phoenix Newspapers* (1953), 76 Ariz. 334, 264 P.2d 413; W. PROSSER, THE LAW OF TORTS 814-15 (4th ed. 1971).

The common law of qualified privilege for media expression was transplanted into the realm of emerging First Amendment doctrine in the landmark case of *New York Times Co. v. Sullivan, supra.* The basic starting point of the *New York Times* opinion was that the publisher discussing public questions is engaged in an activity protected by the First Amendment. Confined to its narrowest formulation, this decision held that the First and Fourteenth Amendments forbade "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proved that the statement was made with 'actual malice'—that is with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-280, 84 S.Ct. at 726. In a subsequent decision, *Curtis Publishing Co. v. Butts*

(1967), 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, the Court extended the *New York Times* privilege to media comments on matters of public interest concerning "public figures." While the meaning of the term "public official" has caused the Court little difficulty,[1] the question of who is or who is not a "public figure" has not been fully resolved by the Court. In *Curtis Publishing Co.* v. *Butts, supra,* Mr. Justice Harlan spoke of the "public figure" as commanding "a substantial amount of independent public interest" at the time of publication. 388 U.S. at 154, 87 S.Ct. at 1991. Several state court cases interpreting the federal standard have found a wide variety of persons to be "public figures" within the *Butts* formulation.[2]

The *New York Times* malice standard has undergone extensive refinement. It was initially determined that "reckless disregard of the truth" meant false statements made with a high degree of awareness of their probable falsity. *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125. Later cases emphasized the distinction between the *New York Times* test of knowledge of falsity or reckless disregard of the truth and "actual malice" in the traditional sense of ill will. *Beckley Newspaper Corp.* v. *Hanks* (1967), 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248; *see also Greenbelt Cooperative Publishing Assoc.* v. *Bresler* (1970), 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6. In a later decision, *St. Amant* v. *Thompson*

---

1. A test was developed for ascertaining the identity of a "public official" within the *New York Times* standard:

"[T]hose among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of public and governmental affairs." *Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597.

2. *See, e.g., Tilton* v. *Cowles Publishing Co.* (1969), 76 Wash. 2d 707, 459 P.2d 8, *cert. denied* 399 U.S. 927, 90 S.Ct. 2238, 26 L.Ed.2d 792 (1970), (policeman and fireman running for election to a municipal health and safety board); *Arber* v. *Stahlin* (1968), 10 Mich.App. 181, 159 N.W.2d 154, *cert. denied,* 397 U.S. 924; 90 S.Ct. 927, 25 L.Ed.2d 103 (1970) (republican party volunteer workers and precinct delegates); *Rose* v. *Koch* (1967), 278 Minn. 235, 154 N.W.2d 409 (a university professor who was both a noted author and a former state legislator at the time of publication); *Grayson* v. *Curtis Publishing Co.* (1967), 72 Wash.2d 999, 436 P.2d 756 (head basketball coach at University of Washington).

(1968), 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, the Court attempted to resolve any remaining uncertainty as to the proper content of the malice standard. The *St. Amant* Court held that reckless conduct could not be measured by whether a reasonably prudent man would have published the alleged libel or would have investigated before publishing; "actual malice" evidence must show "that the defendant in fact entertained serious doubts as to the truth of his publication." 390 U.S. at 731, 88 S.Ct. at 1325.

*Rosenbloom* v. *Metromedia, Inc.* (1971), 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, increased the degree of First Amendment protection afforded the media in previous cases by shifting the focus of the *New York Times* privilege from the person's status to the newsworthiness of the statement published. The *Rosenbloom* plurality opinion held that when a "matter of public or general concern" is published, a private individual may recover for injury caused by defamatory falsehood only if he can prove the publication was made with knowledge that it was false or with reckless disregard of whether it was false—a sweeping extension of the *New York Times* privilege.

Mr. Justice Harlan's *Rosenbloom* dissent urged that a different standard of constitutional privilege should apply to publisher-defendants in libel actions instituted by private individuals. The Harlan formulation adopted a "reasonable man" or simple negligence standard as the proper measure of publisher-defendant liability for otherwise libelous communications. Moreover, as a counterbalancing protective device, this approach limited publisher-defendant liability for negligent defamation to provable "actual damage." Any recovery by private individuals for "presumed" or general damage to reputation required proof of "malice" under the *New York Times* privilege standard. 403 U.S. 67-76, 91 S.Ct. 1811.

A recent First Amendment decision by the United States Supreme Court, *Gertz* v. *Robert Welch, Inc., supra,* has added a new dimension to the accommodation between the First

Amendment and common law defamation. A second and more expansive approach is taken to protect the reputation of the private individual, which is similar to the approach advocated in Justice Harlan's dissent in *Rosenbloom*. Status of the private individual is re-emphasized while "newsworthiness" is de-emphasized. A simple negligence standard is proposed, but liability without fault or libel *per se* cannot become a part of the negligence standard. Damages under this standard are limited to "actual damages."[3] Presumed or general damages to reputation would continue to be contingent upon proof of malice under the New York Times privilege standard. Finally, the states are given the option to define their own standard of constitutional privilege for the defamation of private individuals, but the standard must not provide for liability without fault. The definitional option left to the states is either a *Gertz* or *Rosenbloom* conceptualized privilege. We choose the latter.

## II.

### Indiana Standard

We first assume that the publication of matters which are of general or public concern is an activity protected by Article 1, Section 9 of the Indiana Constitution.[4] Secondly, we assume that factual error is inevitable in the course of free debate and that some latitude for untrue or misleading expression must be accorded to the communications media; otherwise, free, robust debate worthy of constitutional protection would be deterred and self-censorship would be imposed in the face of unpopular controversy. We seek an accommodation between two societal interests: (1) freedom of speech and of the press as it relates to a well-informed community, and (2) protection of the private indi-

---

3. See Justice Harlan's dissenting opinion in *Rosenbloom, supra.*
4. Article 1, Section 9 of the Indiana Constitution provides:
"No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely on any subject whatever: but for the abuse of that right, every person shall be responsible."

vidual's reputation when it is involved in matters of general and public concern.

Indiana's constitutional protection of freedom of expression requires that the interchange of ideas upon all matters of "general or public interest" to unimpaired. In order to fulfill its historic function, freedom of discussion "must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama* (1940), 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093. Emerging principles of free expression "have disclosed the artificiality, in terms of the public's interest, of a simple distinction between 'public' and 'private' individuals or institutions." *Rosenbloom* v. *Metromedia, Inc., supra,* 403 U.S. at 33, 91 S.Ct. at 1818. Even the *New York Times* majority opinion placed primary emphasis on our "profound national commitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open." 376 U.S. at 270-271, 84 S.Ct. at 721 (emphasis added). Comments in other United States Supreme Court decisions reiterate the basic value judgment that constitutional guarantees of free speech and press must extend to all matters which affect our efforts to live and work together in a free society.

We adopt a standard that requires the private individual who brings a libel action involving an event of general or public interest to prove that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of whether it was false.

### III.

#### General or Public Concern

In *Time, Inc.* v. *Hill* (1967), 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456, the Court had "no doubt that the . . . opening of a new play linked to an actual incident, is a matter of public interest." 385 U.S. at 388, 87 S.Ct. at 542. In *Curtis Publishing Co.* v. *Butts* (1967), 388 U.S. 130, 87 S.Ct. 1975, 18

L.Ed.2d 1094, the Court held that an alleged "fix" of a football game was a public issue. Thus, it seems clear that constitutional protection for speech and press was not intended to be limited to matters bearing only on issues of official conduct or the activities of pre-ordained or *de facto* "public figures." Rather, we must conclude that Indiana's constitutional mandate of freedom of the press was designed to advance "truth, science, morality and the arts in general as well as responsible government." *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at 147, 87 S.Ct. at 1987 (Harlan, J. concurring opinion).

When a general or public interest is recognized, it becomes unimportant in terms of ascertaining whether the public has a legitimate interest in an issue or event, whether the person involved is a famous, large-scale distributor of heating and air-conditioning equipment or a "private" businessman operating a similar enterprise in a small community. As Justice Brennan stated in his *Rosenbloom* plurality opinion:

> "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, affect and significance of the conduct, not the participant's prior anonymity or notoriety." 403 U.S. at 43, 91 S.Ct. at 1819.

The key analytic determinant in the application of constitutional protections for speech and press in libel actions by "private" individuals must be whether the communication involved concerns an issue of general or public interest without regard to whether the individual is famous or anonymous.

## IV.

### Public v. Private Reputations

A simple negligence standard would require that the private individual prove only that the publisher failed to exercise

"reasonable care." This standard assumes that society has a greater interest in protecting "private" reputation than safeguarding the community standing and repute of "public officials" and "public figures." Drawing a distinction between "public" and "private" figures makes no sense in terms of our constitutional guarantees of free speech and press. The *New York Times* privilege standard was applied to defamatory falsehood concerning a public official or public figure to give effect to the primary function of our system of free expression —the encouragement of discussion and commentary on public issues. The media was not accorded a special constitutional privilege merely because society has a lesser interest in the protection and vindication of the reputations of public officials and public figures. The reputations of public figures and public officials merit the same quantum of protection as those of private citizens.

Any argument that the private individual, unlike the public figure, does not have access to the media to counter defamatory material focuses on a disparity which is present only in a limited number of situations. Only rarely will a public official or public figure have attained sufficient prominence to command media attention which will provide a meaningful chance to rebut and defend against defamatory falsehood. Even in the rare case where an adequate opportunity for reply is afforded, it is unlikely that the rebuttal statements will receive the same degree of public attention as the published defamation.[5] It would appear that the proper solution for any lack of access on the part of all citizens, whether "public" or "private" is not the expansion of the right to sue for defamation, but rather the passage of state laws creating

---

5. In his *Rosenbloom* plurality opinion, Justice Brennan countered this "access" argument with the statement:

"Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story. When the public official or public figure is a minor functionary or has left the position that put him in the public eye, see *Rosenblatt* v. *Baer*, *supra*, the argument loses all of its force." 403 U.S, at 46, 91 S.Ct, at 1821,

a limited right to respond to defamatory falsehoods.[6] But, alternative remedial measures are, of course, matters for legislative consideration.

Public officials and public figures are as deserving of redress for injury to their reputation as private citizens. The argument that public officials and public figures assume the risk of defamation by voluntarily placing themselves in the public eye is a misconception of the role which every citizen is expected to play in a system of participatory self-government. Every citizen, as a necessary part of living in society, must assume the risk of media comment when he becomes involved, whether voluntarily or involuntarily, in a matter of general or public interest. It has long been recognized that "[e]xposure of the self to others in varying degrees is a concomitant of life in a civilized community." *Time, Inc.* v. *Hill, supra,* 385 U.S. at 388, 87 S.Ct. 542.[7]

---

6. The United States Supreme Court's recent decision in *Miami Herald Publishing Co.* v. *Tornillo* (1974), 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730, which held Florida's right-to-reply statute constitutionally invalid, does not foreclose legislative creation of a limited right of action to compel retraction of libelous statements. *See generally* Note, *Vindication of the Reputation of a Public Official,* 80 HARV. L. REV. 1730, 1939-1947 (1969). Indiana's present "retraction" statute merely requires the prospective libel litigant to serve a written demand for retraction on the offending publisher as a condition precedent to the initiation of judicial proceedings, and limits recovery for "good faith" defamatory falsehood to "actual damages" if a retraction is published within the statutory time period. IC 1971, § 34-4-15-1 and 2.

7. An examination of the values arguably protected by the law of defamation clarifies the individual interests implicated by our decision. Libel law protects at least two distinct interests of the individual: First, his desire to preserve certain aspects of his life from unwarranted intrusion; and second, a desire to preserve his reputation and standing in the community. *See, e.g., Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597. But, the individual's interest in preventing unreasonable intrusion into the private aspects of his life is not implicated in the category of cases under consideration since the media privilege we have created extends only to discussion of matters of general or public concern. Our formulation recognizes that "some aspects of the lives of even the most public men fall outside the area of matters of public or general concern." *Rosenbloom* v. *Metromedia, Inc., supra,* 403 U.S. at 48, 91 S.Ct. at 1822. The argument that "public" figures and officials have voluntarily exposed all aspects of their personality to public view while private individuals have kept their lives free of unwanted publicity ignores the dynamic potential of the emerging law of privacy and its elevation to the level of a "penumbral" constitutional protection.

## V.

### Self-Censorship

The United States Supreme Court recognized in *New York Times Co.* v. *Sullivan, supra,* that a rule requiring the media to guarantee the truth of its news reporting would lead to self-censorship. Publishers, fearful of being unable to prove the truth of their statements, would avoid the publication of controversial articles. We refuse to adopt a rule that would allow private citizens to obtain damage judgments on the basis of a jury determination that a publisher probably failed to use reasonable care. Such a rule would promote self-censorship by causing publishers to "steer far wider of the unlawful zone." *Speiser* v. *Randall* (1958), 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. The uncertainty attendant upon a reasonable care standard would charge the press with "the untolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." *Time, Inc.* v. *Hill, supra,* 385 U.S. at 389, 87 S.Ct. at 543. A publisher's fear of guessing wrong about juror assessment of the reasonableness of the news gathering procedures he employs would inevitably deter "protected" speech. Furthermore, the standard of proof employed in libel actions heightens the risk of self-censorship inherent in a "reasonable care" standard of media privilege. Speaking for the *Rosenbloom* plurality, Justice Brennan observed:

> "Moreover, we ordinarily decide civil litigation by the preponderance of the evidence. . . . In the normal civil suit where this standard is employed, 'we view it as more serious in general for there to be an erroneous verdict in the defendant's favor.' In re Winship, 397 U.S. 358, 371, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement . . . but the possibility of such error, even beyond

*See Roe* v. *Wade* (1973), 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; *Griswold* v. *Connecticut* (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. *See also* T. EMERSON, THE SYSTEM OF FREEDOM OF EXPRESSION 543-547 (1970).

the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate." 403 U.S. at 50, 91 S.Ct. at 1823.

A limit on the recovery of private citizens in libel actions to "actual damages" would not operate to alleviate the uncertainties attendant upon the reasonable care standard adopted by the *Gertz* majority.[8] The *Gertz* Court's broad definition of "actual" injury includes "impairment of reputation and standing in the community," as well as "personal humiliation and mental anguish and suffering." 418 U.S. at 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. Such an expansive definition of "actual damage" will not materially reduce the risk of capricous jury verdicts nor would it deter a jury from punishing the publisher of unpopular ideas.

The threat of media self-censorship arising from the uncertainties incident to a reasonable care standard of media privilege, is largely avoided by the *New York Times* standard of reckless or knowing falsity. While the vagueness of the original standard, phrased in terms of "reckless disregard for the truth," caused some concern about self-censorship,[9] the formulation of the "malice" test in *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262

8. Indiana law reflects the historic rule that publication in written form of statements defamatory *per se*—words which, on their face and without regard to extrinsic facts, tend to injure the reputation of another—subjects a publisher to liability although no harm to reputation is actually proved. *Indianapolis Newspapers, Inc.* v. *Fields* (1970), 254 Ind. 219, 255-56, 259 N.E.2d 651, 667-668, *cert. denied* 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190 (1970); *Gibson* v. *Kincaid* (1966), 140 Ind. App. 186, 201, 221 N.E.2d 834, 843. Under the "presumed damage" rule, juries may award substantial sums as compensation for supposed injury to reputation without any proof that such harm was actually suffered. The uncontrolled discretion of juries in libel actions to award damages in the absence of demonstrable injury necessarily compounds the danger to free expression posed by the vagueness of the reasonable care standard.

9. See the concurring opinion of Justice Black, joined by Justice Douglas in *New York Times* v. *Sullivan* (1964), 376 U.S. at 293, 84 S.Ct. at 733; the concurring opinion of Justice Douglas, joined by Justice Black, in *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 80-83, 85 S.Ct. 209, 13 L.Ed. 2d 125. *See also*, Note, *Free Speech and Defamation of Public Persons: The Expanding Doctrine of New York Times Co.* v. *Sullivan*, 52 CORNELL L. REV. 419, 429-32 (1967).

should provide trial courts with relatively clear guidance. The *St. Amant* Court held that reckless conduct was not measured by whether a reasonably prudent man would have published or would have investigated before publishing; rather, the evidence must show that the defendant in fact entertained serious doubt as to the truth of the statement. 390 U.S. at 731, 88 S.Ct. at 1323. Thus, publisher knowledge of serious factual inconsistencies—facts which negate or materially contradict the impression conveyed by the published statements to some significant extent—would be highly probative evidence of awareness of probable falsity. The publisher's failure to employ any reliable investigatory methods or lack of any effort to independently verify disputed or questionable factual assertions would also be relevant to the issue of reckless disregard for the falsity of published statements. *See Indianapolis Newspapers, Inc.* v. *Fields* (1970), 254 Ind. 219, 244-251, 259 N.E.2d 651, 666-668 (De-Bruler, J. separate opinion). Further guidance as to the proper content of the *New York Times* privilege standard can be gained by examining the many federal and state cases that have focused on the question of constitutional "malice."[10] Note, *The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis*, 70 MICH. L. REV. 1547, 1560-62 and notes 94-96 (1972).

## VI.

### Test

This Court believes that the subject matter test adopted in this opinion—an event or topic of general or public in-

---

10. Many of these cases have been decided favorably to the defendant by summary judgment or directed verdict. *See, e.g., Treutler* v. *Meredith Corp.* (8th Cir. 1972), 455 F.2d 255; *Gospel Spreading Church* v. *Johnson Publishing Co.* (1971), 147 U.S.App.D.C. 207, 454 F.2d 1050; *Time, Inc.* v. *Johnston* (4th Cir. 1971), 448 F.2d 378; *Miller* v. *News Syndicate Co.* (2nd Cir. 1971), 445 F.2d 356; *Dacey* v. *Florida Bar, Inc.* (5th Cir. 1970), 427 F.2d 1292.

terest—will provide both the media and the courts with sufficient guidance as to those matters which are appropriate for public comment and thus accorded the protection of constitutional privilege.

The general or public interest test for applying the "malice" privilege standard will involve the trial courts in the task of deciding what information is or is not relevant to the promotion of free expression. While it is true that this task will not always be easy, the courts have traditionally assumed the role of ultimate arbiters of disputes concerning conflicting constitutional policies. The contention that the judiciary will prove inadequate for such a role would be more persuasive were it not for the sizable body of federal and state cases that have employed the concept of a matter of general or public interest to reach decisions in libel cases involving private citizens.[11] The public interest is necessarily broad; recent decisions dealing with a panoply of topics and events, ranging from organized crime to the quality of food served in a particular restaurant, will assist trial courts in defining the proper scope of the public interest test.[12]

---

11. *See, e.g., Treutler* v. *Meredith Corp.* (8th Cir. 1972), 455 F.2d 255 (announcement of candidacy for municipal office); *Time, Inc.* v. *Johnston* (4th Cir. 1971), 448 F.2d 378 (story of how obscure professional athlete was forced to quit playing basketball ten years before article was published); *Gospel Spreading Church* v. *Johnson Publishing Co.* (1971), 147 U.S.App.D.C. 207, 454 F.2d 1050 (size of the estate left by a church elder); *Washington* v. *New York News, Inc.* (1971), 37 App. Div.2d 557, 322 N.Y.S.2d 896 (attendance by bishop at nightclub performance of a choir singer of his church).

12. *See, e.g., Cantrell* v. *Forest City Publishing Co.* (6th Cir. 1973), 484 F.2d 150 (article concerning family of victim of bridge disaster); *Davis* v. *National Broadcasting Co.* (E.D. La. 1970), 320 F.Supp. 1070, aff'd 447 F.2d 981 (5th Cir. 1971) (report about a person who was involuntarily involved in events relating to the assassination of President Kennedy); *Belli* v. *Curtis Publishing Co.* (1972), 25 Cal.App.3d 384, 102 Cal. Rptr. 122 (article concerning attorney with national reputation); *Time, Inc.* v. *Firestone* (Fla. App. 1972), 254 So.2d 386 (divorce of prominent businessman held not a matter of public concern); *Harnish* v. *Herald-Mail Co., Inc.* (1972), 264 Md. 326, 286 A.2d 146 (article concerning substandard apartment building owned by city official); *Twenty-Five East Fortieth Street Restaurant Corp.* v. *Forbes, Inc.* (1971), 37 App. Div. 2d 546, 322 N.Y.S.2d 408 (quality of food served by restaurant).

## VII.

### *Summary Judgment*

Northwest's motion for summary judgment was granted by the trial court. Aafco contends that a genuine material issue of fact existed and that the trial court's judgment should be reversed. Our review under the Indiana Standard is whether a genuine issue of material fact existed upon the defense of privilege asserted in Northwest's answer. Stated in the context of the privilege: Were there any facts before the trial court which would place in issue Northwest's knowledge that the articles were false or that the articles were published with reckless disregard of whether they were false. We need not concern ourselves with the question of general or public interest of the event since this preliminary consideration has been conceded.

A genuine issue of material fact is one that is dispositive of the litigation. If there are no facts presented by the interrogatories, depositions and affidavits which would place the defense of privilege in issue, the trial court's judgment should be affirmed. *Doe* v. *Barnett* (1969), 145 Ind. App. 542, 251 N.E.2d 688.

The Gary Fire Department report of the fire is as follows:

"Origin and cause of fire: The most heavily burned area was in living room and around stairway leading to attic. Makeshift extension cords running from dining room through wall under stairway to living room for television hook-up, then from the same outlet another extension cord extended to upstair attic for light as this attic was being used for sleeping quarters."

Aafco contends that this brief, routine report eliminates any possible comment on the furnace blower overloading the electrical circuit. Aafco further contends that the factual variance between the report and the published articles raises a clear inference of a reckless disregard for the truth in Northwest's investigatory and reporting techniques.

Aafco's challenge reflects a disagreement with Northwest's choice of inferences. The report coupled with one fire official's assessment suggests several inferences. One choice of inferences may suggest a conclusion much different from a second choice of inferences or a third choice of inferences, but these choices do not constitute falsity or irresponsible reporting. *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at 155, 87 S.Ct. 1975.

The depositions and affidavits established that the articles were wholly based upon information obtained from city officials and from the testimony of participants in the license revocation proceedings conducted by the Gary Contractors' Licensing Board. At most, the circumstances surrounding the publication of the articles indicates that Northwest's reporters may have failed to examine the Fire Department report or possibly misinterpreted the report's conclusion as to the cause of the Collins' fire. But, the evidence discloses no recurrent lack of investigative effort to verify factual statements sufficient to support a reasonable inference of reckless falsity. It must be remembered that:

> "[R]eckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to [support] the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731, 88 S.Ct. at 1325.

The policy at the foundation of the *New York Times* privilege standard is the promotion of free expression. The publisher who maintains a standard of care designed to avoid knowing or reckless falsehood must be accorded sufficient assurance that those factual errors which nonetheless occur will not expose him to indeterminate liability. If a genuine issue of material fact concerning a publisher's reckless disregard for the truth could be raised by a mere showing that the published speech was factually incorrect, the constitutional policy of avoiding media self-censorship would be seriously eroded

·· Assuming that the impression conveyed by the articles was false, we find no evidence in the record that Northwest had any knowledge of the impression's falsity, nor do we find any evidence that Northwest entertained serious doubts of the impression's falsity. Therefore, the trial court's summary judgment should be and the same hereby is affirmed.

Buchanan, J., concurs; Garrard, J., dissents with opinion.

## DISSENTING OPINION

GARRARD, J.—I agree that in the case before us, the materials presented to the trial court for consideration upon the motion for summary judgment were insufficient to establish a genuine issue of material fact upon the defense issue of constitutional malice as defined in *New York Times* v. *Sullivan* (1964), 376 U.S. 254. Furthermore, at the time the trial court rendered its decision, it was guided only by the plurality opinion of *Rosenbloom* v. *Metromedia, Inc.* (1971), 403 U.S. 29, which indicated that application of the *New York Times* standard would be proper.

However, on June 25, 1974, the Supreme Court issued its decision in *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, and by a majority of the Court redefined the applicability of First Amendment privilege as a defense in certain libel actions. It therefore becomes necessary to determine whether Aafco has presented a viable claim on the facts presented under the modification announced in *Gertz.*

In *New York Times* the Court determined that a libelous communication by the news media was privileged unless accompanied by what has come to be known as "constitutional malice". Such malice exists only where the publisher of the libel has actual knowledge of the falsity of the statement or publishes with reckless disregard of probable falsity.

Subsequent decisions have further defined what conduct suffices to establish malice through recklessness. See, e.g. *Garrison* ·v. *Louisiana* (1964), 379 U.S. 64; *St. Amant* v. *Thompson* (1968), 390 U.S. 727.

Here, however, we are concerned with what I conceive. to be a more basic application of the *New York Times* concept. The essence of *New York Times* is the balance between the right of individual members of the public to protection against false and defamatory accusations and the right of the public, in general, to knowledge of the events and affairs that shape their lives.[1] In attempting to achieve this balance, the Court has, and I believe properly so, recognized that if the essential value of an informed public is to be preserved, those responsible for providing that information must be accorded some margin for error. The chilling effect of providing no "breathing space" upon the dissemination of vital information which is either true, but difficult to verify under the burden of proof imposed at trial, or substantially true but containing minor inaccuracies, is well discussed in the federal cases.

Yet it is to be remembered that consideration of the privilege necessarily postulates a defamatory falsehood. As Mr. Justice White, writing for the majority in *St. Amant,* stated:

> "It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity."
>
> \* \* \*
>
> "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." 390 U.S. at 731-32.

Therefore, in broad measure, the public significance of the events at issue has a very real, if difficult to define, bearing on the public justification for sacrificing truth and private reputation. This was well recognized by the Court in

---

1. The First Amendment also has as its purpose protection of the individual's right to express his opinion. I, however, find those applications beyond the purview of those here considered. See, *Curtis Publishing Co.* v. *Butts, infra.*

*Gertz,* but was abandoned as the appropriate rule of law in favor of one providing more predictability.

In *New York Times* and *St. Amant* the Court determined that privilege based on the absence of constitutional malice was justified in reports concerning public officials.

*Curtis Publishing Co.* v. *Butts* and *Associated Press* v. *Walker* (1967), 388 U.S. 130, extended application of the standard to "public figures" because they "are nevertheless intimately involved in the resolution of important public questions, or, by reason of their fame, shape events in areas of concern to society at large." 388 U.S. 164.

Then in *Rosenbloom* v. *Metromedia, Inc., supra,* the Court found the necessity for "constitutional malice" if a mere "private citizen" was to recover for statements made in connection with events involving the discovery of allegedly obscene materials. Justices Burger, Brennan and Blackmun found the qualified privilege requiring application of the *New York Times* standard to be present in "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous". 403 U.S. 44. Mr. Justice White would have limited this extension to those private citizens involved in or affected by the official acts of public servants, which he felt should be reported in full detail.

In this context, the Court came to *Gertz* v. *Robert Welch, Inc., supra.* Gertz was an attorney. A Chicago policeman was convicted of murder and Gertz was retained by the victim's family to represent them in civil litigation against the policeman. An article appearing in defendant's magazine alleged that the policeman's murder trial was part of a communist conspiracy, implied that Gertz (who had no role in the criminal case) had a criminal record, and asserted he was a communist-fronter. When Gertz sued, the court entered judgment *n.o.v.* for the defendant on the basis that there was no showing of the constitutional malice required under the *New York Times* standard.

The Supreme Court in reversing recognized the legitimate state interest in compensating injury to the reputation of private individuals who have been defamed and held that such interest was unduly abridged by the test proposed by the *Rosenbloom* plurality. The Court also anticipated the disadvantages of *ad hoc* determinations that would follow the quest to determine which events were of "public" or "general" interest.

Thus, in an effort at balancing once again the competing interests of the public, the Court, while affirming the "public official" and "public figure" standards previously announced, held that in the case of the non-public official/figure, the interest of protecting the redress for injury inflicted by defamatory falsehood outweighed the "breathing room" requirements necessary to full implementation of the First Amendment, *except* to the extent that the redress sought would permit recovery for more than compensation for actual injury,[2] or would impose liability without fault. In other words, *Gertz* holds that in the case of the non-public official/figure, the First Amendment privilege protects only against liability without fault and (in the absence of constitutional malice) limits damages to actual injury.

Accordingly, when the Court says "the states may define for themselves the appropriate standard of liability", it is merely iterating the absence of constitutional limitation.

In turning then to Indiana law, I find no merit in Judge Staton's ready assumption that Article 1, Section 9 of the Indiana Constitution provides a broader privilege in defense of libel than appears in the First Amendment. Any plain reading of Section 9 must dispel such a notion.

Instead, Indiana case law establishes that in the absence of First Amendment privilege, malice in the connotation of *New York Times* is not a necessary element to recovery.

---

2. Presumed or punitive damages are precluded. Actual injury includes impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering. *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350.

*Wabash Printing and Publishing Co.* v. *Crumrine* (1889), 123 Ind. 89, 21 N.E. 904; *Gabe* v. *McGinnis* (1879), 68 Ind. 538; *Hotel and Restaurant Employees, etc.* v. *Zurzolo* (1968), 142 Ind. App. 242, 233 N.E.2d 784.

Furthermore, while I am very much in accord with preservation of the "breathing room" dimension necessary to a successful protection of the purposes of the First Amendment, I do not believe that it is emasculated by the recognition the *Gertz* majority gives to the competing interest in preserving from defamation one's reputation.

Where either a public official or a public figure is the subject of the report, the privilege exists in the absence of constitutional malice. When, however, the report concerns an otherwise anonymous, or mere "private" citizen, then liability for actual injury will be imposed for a defamatory untruth upon a showing of fault, although that fault be based upon negligence.

While an *ad hoc* determination of whether a particular event is a matter of public interest might be more in keeping with the ultimate purposes of the First Amendment, I am forced to agree that the lack of predictability in that approach might well provide the chilling effect upon reporting which we seek to avoid.

The materials presented to the court below were sufficient to disclose the existence of a disputed genuine issue of material fact: whether appellee negligently libeled a mere private citizen causing actual injury. I therefore believe the summary judgment should be set aside in favor of a trial on the merits.

NOTE.—Reported at 321 N.E.2d 580.