JOURNAL-GAZETTE COMPANY, INC., Appellant–Defendant,

v.

BANDIDO'S, INC., Appellee–Plaintiff.

No. 57A03–9407–CV–248.

Court of Appeals of Indiana.

Nov. 26, 1996.

James P. Fenton, Cathleen M. Shrader, Barrett & McNagny, Fort Wayne, for Appellant–Defendant.

Edward L. Murphy, Jr., Diana C. Bauer, Miller Carson Boxberger & Murphy, Fort Wayne, Robert E. Connolly, O'Dowd Wyneken & Connolly, Fort Wayne, for Appellee–Plaintiff.

## OPINION

GARRARD, Judge.

The Journal–Gazette Company, Inc. appeals the jury verdict entered in favor of Bandido's, a Mexican restaurant chain, in this libel action. We reverse.

**FACTS**

Bandido's operates three Mexican restaurants in Fort Wayne, Indiana and one in Lima, Ohio. On September 13, 1988, the Fort Wayne–Allen County Board of Public Health (Board of Health) inspected the Bandido's restaurant located in the Northcrest Shopping Center in Fort Wayne. Numerous violations were found, including "evidence of

flies, roaches and rodents noted. Advise exterminator to do a full clean out of prem-ise[s]. Rodent droppings noted only in restroom." (R. 1137). Soon thereafter, a pest control service conducted a full clean-out of the restaurant.

On October 4, the Board of Health conducted a second inspection in connection with a hearing scheduled the following day to determine whether to close the restaurant. While there were still several health code violations, there was no evidence of any insects or rodents. After the hearing on October 5, the Board of Health revoked Bandido's food service permit and closed the restaurant, based upon all inspections conducted in 1988.[1]

On October 6, 1988, after obtaining copies of both inspection reports, the Journal ran a story on the front page of the metro-state section regarding the problems at the Bandido's restaurant with the following headline:

**Health board shuts doors of Bandido's**

**Investigators find rats, bugs
at north-side eatery**

(R. 1189). The story was published in the first edition, or the "Ohio Edition," which is circulated in northwest Ohio, with a slightly different subheadline: "Inspectors find rats, roaches at local eatery." (R. 1190). While the story also appeared in the second edition, or the "Indiana Edition," which is circulated in Indiana outside of Allen County, the sub-headline was deleted. The "Final Edition," circulated throughout Allen County, contained both the story and above headlines.

June Remley, a reporter for the Journal, wrote the article at issue after reviewing the inspection reports regarding Bandido's. Through the editing process, the article was transmitted to Sheila Pinkley, a copy editor. It was Pinkley's responsibility to perform a final edit and write an appropriate headline for the article. Pinkley read the article and realized that while the word "rodents" appeared in the text, the word "rats" did not. However, she used the word "rats" in the subheadline, concluding that the word "rodents" suggested "rats." After Pinkley edited the article, it was sent to William Leon-

ard, the Journal's copy desk chief. Leonard did not conduct a word-by-word review of the article, but he saw the words "rodents" and "roaches" and believed that these supported the headline. However, he stated that, if he had realized that the word "rats" did not appear in the article, he would have changed the headline. Ellen Garner, a news editor, next reviewed the article, and the article was then forwarded to Tom Jones, a copy editor responsible for reading the page proofs. Neither Garner nor Jones noticed that the word "rats" did not appear in the article.

With regard to headlines, the policy of the Journal was that, if a word appears in a headline, it should also appear in the text of the article. The Journal also made periodic employee evaluations. Pinkley's job performance evaluation in July of 1988 indicated a weakness in her ability to write news headlines: "[Y]our headline performance lacks consistency. There have been instances when you produced inaccurate heads—and this is something we just can't have." (R. 1625). Leonard's job performance evaluation in March of 1988 stated:

> [I]t's time to concentrate on Sheila [Pinkley]. . . . She has potential and needs a guiding hand, particularly in headline writing. Despite all the successes in the headline area, there are still headlines that are vague, off-target or inappropriate. Sometimes those heads appear when you are in slot; more often they appear on your days off. But as a manager, one of your tasks is to develop the staff so that it is not obvious when you are off duty. Your guidance should show through the paper regardless of your actual presence.

(R. 1632).

At trial, a journalism expert for Bandido's testified that the word "rats" should not have appeared in the subheadline and that it was extremely careless for the error to have occurred. The expert further testified that, from a journalistic perspective, there is no difference between extreme carelessness and reckless disregard. A journalism expert for the Journal agreed that it was a mistake for the word "rats" to appear in the headline.

---

1. The Northcrest Bandido's had also been closed    by the Board of Health in January of 1988.

Indeed, there was little dispute at trial that the Journal made a mistake. Leonard readily conceded as much, but he further indicated that he saw no particular danger in using the word "rats." However, several witnesses who were readers of the Journal testified that the word "rats" had left a derogatory impression on them. Bandido's expert testified that using the word "rats" in conjunction with a restaurant was an extremely sensitive issue and should have alerted the Journal to use extra care in publishing the headline.

The same day that the article was published, the owner of Bandido's and his attorney met with representatives of the Journal, demanding an immediate and full headline retraction based upon the fact that there was no evidence of rats found at the restaurant. The Journal refused to print a headline retraction, but did publish a retraction in a follow-up article published the next day regarding the expected reopening of the restaurant:

> Because of an editing error, a headline—not the story—in some editions of Thursday's Journal–Gazette said inspectors had found rats and bugs at the restaurant. No evidence of rats was found at the restaurant. The Journal–Gazette apologizes for the inaccuracy of the headline.

(R. 1203). These were the third and fourth paragraphs in an article favorable to Bandido's which included quotes from Bandido's owner.[2] After publication Bandido's attorney sent two letters to the Journal expressing satisfaction with the retraction. However, the owner of Bandido's was not satisfied, and on October 18, 1988, Bandido's demanded a full retraction in compliance with Ind. Code § 34–4–15–1. Upon the Journal's refusal, Bandido's filed suit on November 21, 1988.

In *Bandido's, Inc. v. Journal Gazette Co., Inc.*, 575 N.E.2d 324 (Ind.Ct.App.1991), *reh'g denied, trans. denied* (*Bandido's I*), we reversed the trial court's entry of summary judgment, finding that there remained a factual dispute on the issue of whether the Journal published the article with actual malice. At trial, the jury returned a verdict in favor of Bandido's in the amount of $985,000.00, and the Journal now appeals.

## DISCUSSION

The parties raise numerous issues for our review; however, we address only the following issue: Whether the evidence was sufficient to demonstrate by clear and convincing evidence that the Journal published the sub-headline with actual malice. We conclude that the evidence was insufficient.

■ Under the First and Fourteenth Amendments to the United States Constitution, public officials and public figures may not recover for defamation absent a showing by clear and convincing evidence that the defendant published a defamatory falsehood with actual malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (requiring actual malice for public officials); *see Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (requiring actual malice for public figures). A defamatory falsehood is made with "actual malice" when it is published "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–280, 84 S.Ct. at 726.

■ In order to prove that a defendant published with reckless disregard, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Chester v. Indianapolis Newspapers, Inc.,* 553 N.E.2d 137, 140 (Ind.Ct.App. 1990), *reh'g denied, trans. denied.* Evidence of an extreme departure from professional journalistic standards, without more, cannot provide a sufficient basis for finding actual malice. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 665, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989). However, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Id.* at

---

**2.** *See Bandido's, Inc. v. Journal Gazette Co., Inc.,* 575 N.E.2d 324, 328 (Ind.Ct.App.1991) (Article which included retraction "could only be considered favorable to Bandido's.").

667, 109 S.Ct. at 2686. While the standard is clearly a subjective one,

> [p]rofessions of good faith [by a defendant in a defamation action] will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation, Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326.

■ The first issue the parties dispute is whether Bandido's is a private or a public figure. In Indiana, the actual malice standard applies to a private individual who brings a libel action involving an event of general or public interest. *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580, 586 (1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1975).[3] The case before us previously came up on appeal from summary judgment granted in favor of the Journal. Based upon application of the actual malice standard under *Aafco*, we reversed and remanded for trial. *Bandido's I*, 575 N.E.2d 324. At trial, one jury instruction referred to Bandido's as a limited purpose public figure.[4] (R. 850). The Journal argues that, because Bandido's failed to object to this instruction, Bandido's was conclusively established to be a public figure for purposes of this trial. As a result, the Journal maintains that we must employ a heightened standard of review in this case pursuant to *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose*, the Supreme Court held

that an appellate court has an obligation to make an independent examination of the entire record to ensure that the judgment does not intrude on the First Amendment right of free expression in cases involving the *New York Times* actual malice standard. *Id.* at 499, 104 S.Ct. at 1958. However, because we decide that reversal is required even upon our well-established standard of review regarding sufficiency of the evidence, we decline to address this issue.

■ In addressing a claim of insufficiency of the evidence, we will neither reweigh the evidence nor judge the credibility of witnesses. *Schultheis v. Franke*, 658 N.E.2d 932, 938 (Ind.Ct.App.1995), *trans. denied*. We consider only the evidence most favorable to the verdict, and if substantial evidence of probative value supports the verdict it will not be set aside. *Id.*

■ Our review of the evidence reveals that, while the Journal may well have been extremely careless in printing the subheadline with the word "rats", there is not sufficient clear and convincing evidence to demonstrate that the paper had knowledge that the headline was false or that the paper entertained serious doubts as to the truth of the headline. Pinkley realized that the word "rats" did not appear in the article, but believed that the word "rodents" supported using the word "rats." Those reviewing the article either failed to realize that the word "rats" did not appear in the article or believed that "rodents" supported the use of the word "rats." This evidence showed that the Journal's conduct fell below reasonable journalistic standards and its own guidelines; however, this evidence alone does not establish actual malice. Thus, we must look to what additional evidence supports the verdict.

---

**3.** This author dissented in *Aafco*. *Aafco*, 321 N.E.2d at 591 (Garrard, J., dissenting). I further expressed my disagreement with the application of the actual malice standard to private libel plaintiffs, as opposed to a negligence standard, in *Patten v. Smith*, 172 Ind.App. 300, 360 N.E.2d 233, 238 (1977) (Garrard, J., concurring in result with opinion in which Hoffman, J., concurred). However, given that *Aafco* has been applied in several subsequent cases without disapproval

from our supreme court, *stare decisis* dictates its application here.

**4.** We note that the jury was also instructed that if the material published concerned an event of general or public interest, the plaintiff must prove actual malice, as required by *Aafco*. (R. 882).

In a previous court case, the Journal sought and received access to Board of Health inspection reports. In its ruling granting access, the Allen Superior Court noted that "there *is* a possibility that public disclosure of the inspection reports might result in improper inferences or interpretations as to the seriousness of the violations noted." (R. 1702) (emphasis in original). Bandido's refers to the court's statement as a "warning" to the Journal. However, our reading of the court's order is that this statement referred to the court's belief that the health department was motivated by legitimate concerns in failing to make its inspection records public, as opposed to constituting a "warning" to the Journal. Although we stated in *Bandido's I* that "this 'warning' ... in no way tends to prove actual malice in the instant case [,]" the court's order was admitted as evidence. *See Bandido's I*, 575 N.E.2d at 327. We remain convinced that the court's statement does not tend to show actual malice in this case.

Next, Bandido's points to the fact that the subheadline appeared only in the first and final editions of the Journal, and not in the second edition, which was circulated in Indiana outside of Allen County (an area in which there were no Bandido's restaurants), as evidence of actual malice. We also addressed this evidence in *Bandido's I*, noting that "[a]lthough a plausible explanation is that the item was not as newsworthy in areas serviced by the second edition, the inference favorable to Bandido's is that inclusion of the article [5] in only the first and third editions was motivated by actual malice." *Id.* at 328. We similarly conclude here that this fact provides some evidence of actual malice.

The job evaluations of both Pinkley and Leonard, which noted difficulties Pinkley had in the headline writing area, were also introduced at trial. While this evidence shows a general awareness of the need to take extra care in regard to headlines written by Pinkley, and thus may be regarded as some evidence of actual malice, we conclude that it does little to prove that the newspaper in this particular case in fact entertained serious doubts as to the truth of the subheadline. In fact, the newspaper had in place a process through which several people reviewed each article and headline before it was published; the failure to correct this mistake demonstrates negligence more than actual malice. *See Chester*, 553 N.E.2d at 140 ("The publisher who maintains a standard of care designed to avoid knowing or reckless falsehood must be accorded sufficient assurance that those factual errors which nonetheless occur will not expose him to indeterminate liability."), *quoting Aafco*, 321 N.E.2d at 591. Thus, we find the job evaluations to be of limited value in tending to prove actual malice.

█ Finally, Bandido's points to the Journal's failure to publish a retraction in accordance with I.C. § 34–4–15–1 as evidence of actual malice. Again, in *Bandido's I* we addressed this evidence and, while finding it to be admissible on the issue of actual malice, we expressed some reservation as to whether such evidence proves the existence of actual malice in this case. *Bandido's I*, 575 N.E.2d at 328. I.C. § 34–4–15–1 provides that a newspaper may limit a plaintiff's recovery to actual damages by publishing a retraction within a certain time frame if the retraction is published "in as conspicuous a place and type as the original item appeared." I.C. § 34–4–15–1(b)(2). Thus, the Journal was under no duty to publish any retraction, as the statute relates only to mitigation of damages. Indeed, the court instructed the jury that the Journal had no duty to issue any retraction and "[y]ou may not consider any failure of the defendant to engage in these types activities [sic] as evidence of the existence of actual malice at the time of publication." [6] (R. 861). We find little, if any, tendency to show actual malice, i.e., that the statement was published with knowledge that it was false or with reckless disregard of whether it was false or not, from the failure to print a retraction conforming to this statute.

---

5. Evidence at trial showed that the article did appear in all three editions; only the subheadline was omitted from the second edition.

6. The court also instructed the jury that it could draw whatever inference it wished from the Journal's response to Bandido's request for a retraction.

It may well be that the evidence in this case demonstrated an extreme departure from professional standards; however, this alone is not enough to establish actual malice. Even upon consideration of all the evidence supporting the verdict, we cannot conclude that there was sufficiently clear and convincing evidence to demonstrate that the Journal knew or in fact entertained serious doubts as to the truth of the subheadline. This was not a case where there was no support whatsoever for the false statement; here, while the subheadline was inaccurate and false, it was not fabricated or the product of the publisher's imagination. *See St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. Neither was the subheadline so inherently improbable that only a reckless person would have published; it was undisputed that the inspection report indicated that rodent droppings were found at the restaurant. *See id.* There was no reason to doubt the accuracy of this report; rather, the Journal made an extremely careless error in replacing the word "rodent" with "rat." Extremely careless errors, however, do not constitute actual malice. In the area of free speech, such cases are to be anticipated:

> The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies. 401 U.S. at 292, 91 S.Ct. at 640 [citing *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971)]. "Realistically, ...

some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)] and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." *Herbert v. Lando,* 441 U.S. 153, 171–172, 99 S.Ct. 1635, 1646–1647, 60 L.Ed.2d 115 (1979). "[E]rroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *New York Times Co. v. Sullivan,* 376 U.S. at 271–272, 84 S.Ct. at 721–722 (citation omitted).

*Bose,* 466 U.S. at 513, 104 S.Ct. at 1966 (as appeared in original).

The judgment of the trial court is reversed.

HOFFMAN and DARDEN, JJ., concur.