Glenn R. GINTERT, Robin Gintert, Lee Goodman, Marlene Goodman, Granville Quillen, Mary Quillen, William Sampson and Rita Sampson, on behalf of themselves and all other property owners in the Dalecarlia Fairways Subdivision in Lake Dalecarlia Community, Plaintiffs,

v.

HOWARD PUBLICATIONS, INC., Defendant.

No. H 82–579.

United States District Court, N.D. Indiana, Hammond Division at Lafayette.

June 9, 1983.

Edward R. Hannon, Indianapolis, Ind., Robert L. Bauman, Lafayette, Ind., for plaintiffs.

Fred M. Cuppy, Merrillville, Ind., for defendant.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This case was originally filed in Hammond, Indiana, on July 28, 1982, and was subsequently transferred by agreement of the parties to the Lafayette Division of this Court. This action is presently before the court on defendant's motion for summary judgment.

The plaintiffs are all citizens and residents of the State of Indiana who own real estate located in the vicinity of the Lake Dalecarlia Community in Lake County, Indiana. The defendant is a corporation organized under the laws of the State of California with its principal place of business in Oceanside, California; it is therefore a citizen and resident of the State of California. Accordingly, the jurisdiction of this court is grounded in diversity of citizenship under 28 U.S.C. § 1332.

The defendant, Howard Publications, Inc., owns and publishes *The Times,* a daily newspaper of general circulation printed, published and distributed in Hammond, Indiana. During the period of May 23, 1982, through June 5, 1982, *The Times* published a series of short articles regarding environmental conditions around Lake Dalecarlia. These articles are attached hereto as appendices to this Memorandum and Order. None of the plaintiffs are designated by name in any of the aforesaid articles.

This court has held two formal proceedings in this matter. The first was in Lafayette, Indiana, on December 20, 1982, in which a schedule was established for the filing and responding to motions for summary judgment. The second was on May 5, 1983, where the court heard extensive oral arguments on the pending motion for summary judgment filed by the defendant. Said pending motion for summary judgment has also been fully and extensively briefed and supplemental material has been filed and exchanged in accordance with the proceedings in this case of May 5, 1983.

The requisites for granting summary judgment are found at Rule 56(c) of the Federal Rules of Civil Procedure, which states in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admis-

sions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A careful examination of the pleadings, interrogatories, and the affidavit of Walter J. McCarthy, as well as the articles in question, reveals that there are no issues of fact to be resolved and that this court may render a decision by applying the law to the facts.

## I.

The initial question confronting this court is whether the plaintiffs have stated a cognizable claim under the tort law of group libel. Because this court is sitting in diversity, it is axiomatic that the substantive law of the forum, viz., Indiana, must govern. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It should also be noted that summary judgment may be peculiarly appropriate in libel cases. Thus, as the court held in *Schuster v. U.S. News & World Report, Inc.,* 459 F.Supp. 973 (D.Minn.1978):

> Summary judgment is proper only if no genuine issue of material fact exists. While always an extreme procedure, summary judgment is more apt to be appropriate in a libel case where considerations of constitutional freedoms arise. To permit a meritless action to proceed beyond the pleading stage to trial would further chill publishers and speakers in the exercise of their first-amendment rights. (citations omitted).

*Id.* at 975. (The Court in *Schuster* went on to grant defendant's Motion for Summary Judgment based on the principles of group libel). In that same vein, see *Fadell v. Minneapolis Star & Tribune Co.,* 425 F.Supp. 1075 (N.D.Ind.1975), *aff'd,* 557 F.2d 107 (7th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977), and the cases collected therein.

The complaint was filed by eight named plaintiffs on behalf of themselves and all other property owners in the Dalecarlia Fairways Subdivision in the Lake Dalecar-

lia Community. Plaintiffs' answers to defendant's interrogatories show that this proposed class is made up of approximately 165 property owners in Dalecarlia Fairways Subdivision. The import of Counts I, III and IV of plaintiffs' complaint is that a series of articles written and published by the defendant concerning Lake Dalecarlia, its residents, its septic and sewer problems, its overall environmental condition, and a high incidence of cancer in the area are defamatory and libelous per se and that the plaintiffs are entitled to both compensatory and punitive damages. Count II of plaintiffs' complaint sounds in negligence, i.e., the defendant allegedly failed in its duty to investigate and make a responsible inquiry prior to publication of the articles.

In its answer, the defendant admitted that on various dates it published certain articles concerning Lake Dalecarlia, and admitted that said publications indicated that the residents of that community have been and continue to be subject to a substantially higher risk of contracting cancer and dying of cancer than persons residing elsewhere.

The plaintiffs' complaint establishes the fact that the articles and any statements therein concern a group, i.e., the community of Lake Dalecarlia. The pertinent portions of plaintiffs' complaint are as follows:

### COUNT I

2. ... which community was subject to a series of defamatory and negligently published articles by said defendant.

3. ... published articles, ... which stated that the Lake Dalecarlia community was and is a cancer cluster, in that the residents of said community have been and continue to be subjected to substantially higher risks of contracting cancer and of dying of cancer than persons living elsewhere.

4. ... articles which stated that the lake and drinking water of the Lake Dalecarlia community was contaminated and linked casually to said "cancer cluster."

## COUNT IV

2. ... contains accusations that the Lake Dalecarlia residents, a group to which the plaintiffs and potential plaintiffs herein belong, brought the falsely stated "cancer cluster" on themselves ...

The group nature of the libel is clearly indicated in the plaintiffs' answer to interrogatory 15: "each representative plaintiff is now forced to live with the stigma associated with living in the Lake Dalecarlia area, a community accused falsely of being unclean by the defendant." As noted above, the plaintiffs' complaint and answers to interrogatories reveal that their claim is that of "group" libel.

■ The law is well settled that defamation of a large group gives rise to no cause of action on the part of an individual member of that group unless he can show special application of the defamatory matter to himself. *Arcand v. The Evening Call Publishing Company,* 567 F.2d 1163 (1st Cir. 1978), citing Tanenhaus, *Group Libel* 35 Cornell L.Q. 261, 263 (1950); *Restatement, Torts,* Section 564A, Comment A; *Neiman-Marcus v. Lait,* 13 F.R.D. 311 (S.D.N.Y. 1952). This proposition stems from the requirement in a libel action that the plaintiff show that the alleged libelous words were spoken of him. The application of this requirement to statements allegedly libeling a group was early applied in Indiana in the case of *Harvey v. Coffin,* 5 Blackford 566 (1841). In that case the Supreme Court of Indiana reversed a verdict for the plaintiff based on the refusal of the trial court to give the following instruction:

It is not actionable to charge one of three persons with committing a larceny, unless the one of whom the defendant spoke can be identified.

*Id.* at 568. In that case, plaintiff was one of Mr. Coffin's three sons and the defendant was an individual who stated either that "one of Coffin's boys stole my corn," or "I caught one of Coffin's boys stealing corn." The Supreme Court held the statements not to be actionable language. In so doing the Court reviewed the Indiana law on slanderous words:

In an action for slanderous words charging a crime, the criminal act must be imputed to the plaintiff. If it be uncertain of whom the words were spoken, the action is not maintainable. In the case of *Wiseman v. Wiseman,* Cro.Jac., 107, the words were, "my brother is perjured." After verdict, it was resolved that the plaintiff should have judgment, but it was conceded that if the words had been "one of my brothers is perjured," the action would not have lain, because it would then have appeared to the Court, that the defendant had more than one brother, and the want of certainty to which brother the words related, would not have been cured by the averment and the verdict. So, in *Brown's* case, 1 Roll, Abr., 81, where three men had given evidence, and the defendant said to them, "one of you three is perjured," it was held that neither of them could maintain an action for the words spoken, because it was uncertain to which the three the speaker alluded. The law is settled to conformity with the foregoing decisions.

*Id.* at 568–69. In reviewing the articles in the present case, none of the eight enumerated plaintiffs was mentioned. In fact, no names were mentioned in any of the articles. The articles are referring to residents of Lake Dalecarlia in general and as such there is no way to be certain against which, if any, individual any of the language is directed.

Although research by this court has failed to disclose any recent Indiana cases on group libel, the requirement of certainty of reference to the plaintiff has recently been reiterated. In *Lee v. Weston,* Ind.App., 402 N.E.2d 23 (1980), the court found no cause of action when the plaintiffs were unable to establish that the allegedly libelous words concerned them.

Defamatory words are not actionable unless they refer to some ascertained or ascertainable person, and that person must be the plaintiff. 18 I.L.E. *Libel and Slander* § 13, *Doan v. Kelley,* (1889) 121 Ind. 413, 23 N.E. 266; *Prosser v. Callis,*

(1899) 117 Ind. 105, 19 N.E. 735; *Smawley v. Stark*, (1857) 9 Ind. 386; *Bidwell v. Rademacher*, (1894) 11 Ind.App. 218, 38 N.E. 879.

*Id.* at 30. Further, the Court in *Lee v. Weston* referred to the Indiana statute on libel, Ind.Code § 34–1–5–1 (Burns Ann. 1973), which reads as follows:

> In an action for libel and slander it shall be sufficient to state generally that the defamatory matter published or spoken was of the plaintiff; and if the allegation be denied, the plaintiff must prove on the trial the facts, showing that the defamatory matter was published or spoken of him.

In this case the named plaintiffs cannot show that any matter was published or spoken of them specifically. As it is uncertain of whom the words were spoken, it would appear that the plaintiffs cannot maintain a claim for libel. Such a conclusion is compelled by the Restatement Second, Torts § 564A, which declares as follows:

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if,
>
> (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or
>
> (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.

As the Comment and Illustrations to § 564A make clear, the general rule is that no action will lie for the publication of defamatory words directed at a large group. This fact is emphasized in Professor Prosser's hornbook, Law of Torts (4th ed., 1971), at 750, wherein he remarks that

> [i]f the group is a very large one . . . they [defamatory words] are considered to have no application to anyone in particular . . . . Not only does the group as such have no action, but the plaintiff does not establish any personal reference to himself.

\*　　\*　　\*　　\*　　\*　　\*

The rule has been applied quite uniformly to comparatively large groups or classes of a definite number, exceeding, say twenty-five persons.

*See also* Lewis, "The Individual Member's Right to Recover for a Defamation Leveled at the Group," 17 Miami L.Rev. 519 (1963); 70 A.L.R.2d 1382.

The concept of group libel has gained favor neither with the courts nor with the treatise writers. Further, it should be emphasized that there is no suggestion that Indiana would adopt the limited concept of group libel set out in the Restatement, supra, and by the late Dean Prosser. That the Indiana courts have not done so is abundantly clear from an examination of the case law. Finally, even if such a concept were to be adopted by the highest courts of Indiana, it would not afford the plaintiffs in this matter any relief because of the size of the complainant group and the absence of anything in the articles which would identify any of the complainants as targets.

Claims based on group libel have been dealt with by many courts. In reviewing this law on group libel and defamation several principles emerge. These are well stated in the recent case of *Arcand v. The Evening Call Publishing Company, supra. Arcand* was an appeal from the District Court in Massachusetts applying the substantive law of that state. That Court found little recent case law and proceeded on the assumption that Massachusetts law would be in accord with the current state of authorities, i.e., it would not occupy an eccentric minority position. 567 F.2d at 1164.

The principles enunciated were as follows:

1. Defamation of a large group gives rise to no civil action on the part of an individual member of the group unless he can show special application of the defamatory matter to himself. Tanenhaus, *Group Libel,* 35 Cornell L.Q. 261, 263 (1950); *Restatement, Torts,* § 564A, Comment a; *Neiman-Marcus v. Lait,* 13 F.R.D. 311 (S.D.N. Y.1952).

2. A civil action will be recognized if a defamatory statement applies to all members of a small group. 35 Cornell L.Q. 261, 263, *supra; Neiman-Marcus v. Lait, supra,* (defamation of all of group of 9 models and 25 salesmen); *Fawcett Publications, Inc. v. Morris, supra,* 377 P.2d at 42 (statement covering all members of Oklahoma University Football Team); Harper & James, *The Law of Torts,* Volume 1, page 367 (1956); *Restatement, Torts,* 2nd, § 564A, Comment b.

3. Defamation of a part of a group can give rise to a cause of action. As the restatement puts it, "in general, there can be recovery only if a high degree of suspicion is indicated by the particular statement. Thus the assertion that one man out of a group of 25 has stolen an automobile may not sufficiently defame any member of the group, while the statement that all but 1 of a group of 25 are thieves may cause a reflection upon each of them." *Restatement, Torts,* 2nd, § 564A, Comment c; *Neiman-Marcus v. Lait, supra,* 13 F.R.D. at 315; Riseman, Democracy and Defamation: Control of Group Libel, 42 Col.L.Rev. 727, 768 (1942).

*Id.* at 1164–65. *Accord, Golden North Airways v. Tanana Publishing Company,* 218 F.2d 612 (9th Cir.1955); *Brewer v. Hearst Publishing Company,* 185 F.2d 846 (7th Cir. 1950); *Fowler v. Curtis Publishing Company,* 182 F.2d 377 (D.C.Cir.1950); *Service Parking Corp. v. Washington Times Company,* 92 F.2d 502 (D.C.Cir.1937); *National Nutritional Foods v. Whelan,* 492 F.Supp. 374 (S.D.N.Y.1980); *Loeb v. Globe Newspaper Company,* 489 F.Supp. 481 (D.Mass. 1980); *Michigan United Conservation Clubs v. CBS News,* 485 F.Supp. 893 (W.D.Mich. 1980); *Schuster v. U.S. News and World Report, Inc.,* 459 F.Supp. 973 (D.Minn.1978); *Robinson v. Guy Gannett Publishing Company,* 297 F.Supp. 722 (D.Maine 1969); *Watts-Wagner Company, Inc. v. General Motors Corporation,* 64 F.Supp. 506 (S.D.N. Y.1945).

The Court in *Michigan United Conservation Clubs v. CBS News, supra,* cited Professor Prosser on the rule in regard to the circumstances of publication reasonably giving rise to the conclusion that there is a particular reference to the member in order for a libel action to be maintained.

The plaintiff must first of all show that he is in fact a member of the class defamed. Beyond this, he must establish some reasonable personal application of the words to himself. If the group is a very large one, as in the case of such words as "all lawyers are shysters," they are considered to have no application to anyone in particular, since one might as well defame all mankind. Not only does the group as such have no action, but the plaintiff does not establish any personal reference to himself. But if the plaintiff is the only lawyer present, or for some other reason the words are reasonably understood by the hearers to be directed individually at him, the personal application may be made to appear by pleading and proof of the special circumstances by way of inducement, and the innuendo. The rule has been applied quite uniformly to comparatively large groups or classes of a definite number, exceeding, say 25 persons. When the group becomes smaller than that, as in the case of a jury, a family, an election board or the 4 officers of an association, the Courts have been willing to permit the conclusion that the finer of defamation is pointed at each individual. W. Prosser, *supra,* § 112, pages 750–751. (footnotes omitted)

485 F.Supp. at 898.

The Court went on to state the philosophy behind such a rule.

The rule thus stated by the Courts and text writers represents, undoubtedly what has been regarded as a sound compromise between the conflicting interests involved in libel cases. On the one hand is the social interest in free press discussion of matters of general concern, and on the other hand is the individual interest in reputation. The Courts have chosen not to limit freedom of public discus-

sion except to prevent harm occasioned by defamatory statements reasonably susceptible of special application to a given individual.

*Id.* In the case presently before the court the philosophy behind the rule on group libel is most important. The environmental conditions and any possible relationship to the high incidence of cancer are matters of public concern wherein the interest in free press and discussion of such matters is paramount. As the articles have no statements that are reasonably susceptible of application to any given individual, the interest of the defendant should prevail.

The Court in *National Nutritional Foods Association v. Whelan, supra,* found that words used concerning the health food industry were not actionable by individuals in that industry. The Court relied on the general common law rule that group libel is not actionable, citing *The King v. Alme & Nott,* 3 Salk. 224, 91 Eng.Rep. 790 (1699). Obviously, the rule of law is well settled. In *Whelan,* the Association and three of its members brought the libel action against a nutritionalist and a doctor who had authored articles declaring the health food industry to be a "rip off" and that the industry contained "vitamin quacks" and "health quackery". The Court there sustained the defendants' motion under Federal Rules 12(B)(6) and 56(c) for dismissal and summary judgment. The class defamed was not sufficiently small so that the disparaging terms could be said to apply to all of its members and none of the alleged libels in any manner named or specifically suggested any of the plaintiffs. 429 F.Supp. at 380. In this case there is likewise no specific mention of the named plaintiffs or anyone in the Dalecarlia Fairways Subdivision. It cannot be seriously maintained that a group of 165 landowners is sufficiently small for the allegedly disparaging comments to be said to apply to all members.

There were 24 plaintiffs representing a group of employees totaling 325 who were employed by the Union Leader in *Loeb v. Globe Newspaper Company, supra.* Citing the guiding principles from *Arcand,* the Court found no liability with respect to the claims as the excerpts in question were not sufficiently specific in their reference to plaintiffs, and that summary judgment was appropriate. 489 F.Supp. at 483. In so doing the Court also addressed the fact that under the rule a claim would lie if the defamatory statement applied to all members of a small group. The Court held the claimant could not come within this principle merely by denominating a small subset of a large group of plaintiffs, unless the small group so defined reasonably appeared to have been identified by the text. *Id.* at 484. As in *Loeb* the plaintiffs herein cannot come within the rule regarding small groups by designating the 165 owners in Dalecarlia Fairways Subdivision. This group is not defined or identified in the test and, therefore, cannot fall within this principle of group libel.

The case most often cited on group libel is *Neiman-Marcus v. Lait, supra.* The plaintiffs in *Neiman-Marcus* were nine models, 15 salesmen of a total of 25 salesmen and 30 saleswomen of a total of 382 saleswomen employed by Neiman-Marcus. In applying the general rules outlined above, the Court sustained the claim for the nine models and the 15 salesmen but denied any action on the part of the 30 saleswomen. In so doing, the Court reiterated the general law of libel as to groups.

Where the group or class libeled is large, none can sue even though the language used is inclusive. (Citations Omitted). Where the group or class libel is small, and each and every member of the group or class is referred to, then any individual member can sue. (Citations Omitted).

.	.	.	.	.

The plaintiff saleswomen are in a different category. The alleged defamatory statement in defendants' book speaks of the saleswomen generally. While it does not use the word "all" or similar terminology, yet it stands unqualified. However, the group of saleswomen is extremely large, consisting of 382 members at the time of publication. No specific

individual is named in the alleged libelous statement. I am not cited to a single case which would support a cause of action by an individual member of any group of such magnitude. The Court have allowed suits where the group consisted of four coroners (Citation Omitted), twelve doctors composing the residential staff of a hospital (Citation Omitted), a posse (Citation Omitted), twelve radio editors (Citation Omitted) and in similar cases involving small groups.

But where the group or class disparaged is a large one, absent circumstances pointing to a particular plaintiff as the person defamed, no individual member of the group or class has a cause of action. (Citation Omitted). Thus actions for libel have failed where the groups libeled consisted of all officials of a state-wide union, (Citation Omitted), all the taxicab drivers in Washington D.C., (Citation Omitted), the parking lot owners in downtown Washington, D.C. (10 to 12 in number), (Citation Omitted), or the members of a clan, (Citation Omitted).

Giving the plaintiff saleswomen the benefit of all legitimate favorable inferences, the defendants' alleged libel cannot reasonably be said to concern more than the saleswomen as a class. There is no language referring to some ascertained or ascertainable person. Nor is the class so small that it follows that defamation of the class infects the individual of the class. This Court so holds as a matter of law since it is of the opinion that no reasonable man would take the writers seriously and conclude from the publication a reference to any individual saleswomen. (Citation Omitted).

While it is generally recognized that even where the group is large, a member of the group may have a cause of action if some particular circumstances point to the plaintiff as the person defamed, no such circumstances are alleged in the amended complaint. This further exception is designed to apply only where a plaintiff can satisfy a jury that the words *referred solely or especially to himself.* (Citations Omitted). The plaintiffs' general allegation that the alleged libelous and defamatory matter was written "of and concerning ... each of them" is insufficient to satisfy that requirement. (Emphasis Supplied).

Accordingly it is the opinion of this Court that as a matter of law the individual saleswomen do not state a claim for libel upon which relief can be granted and the motion to dismiss their cause of action is granted.

13 F.R.D. 315–317. The conclusion that the plaintiffs in this case do not have a claim can be clearly drawn after comparing the facts with those of *Neiman-Marcus.* If none of the saleswomen in the group of 325 had a cause of action when the article specifically referred to the "saleswomen" of *Neiman-Marcus* then the plaintiffs herein, who have nothing more than the general reference to residents of an entire community in the articles, cannot possibly have a cause of action for libel.

The plaintiff in *Watts-Wagner Company, Inc. v. General Motors Corporation, supra,* was an individual engaged in the manufacture, sale and distribution of a battery additive. The articles in question were warning American motorists and battery dealers against the "army of racketeers who were sweeping the country, taking advantage of the circumstances by selling the unwary car owners or battery dealer some fancy package flour, sand, Epsom Salts, or just any old white powder as the panacea for all battery troubles." 64 F.Supp. at 507. The Appeals Court sustained the Trial Court's granting of the Defendant's Motion to Dismiss for failure to state a claim upon which relief can be granted based on the general law of group libel.

In general, defamatory statements used broadly in respect to a general class of persons give no right of action to a member of the class, unless some circumstance makes the statements reasonably susceptible of special application to any individual of the class. (Citations Omitted). *Id.* at 508. The Court held that the defamatory statements constituted a nonactionable class libel as the Plaintiff was no way

identified with it and the Complaint was insufficient and thereby dismissed. *Id.*

Similarly, in an action by a Columbia taxicab driver against the Curtis Publishing Company regarding an article describing Washington, D.C. taxicab drivers as dishonest and as cheating customers whenever an opportunity arose, the Appellate Court upheld the District Court's conclusion that the driver had not stated a cause of action. The Court in *Fowler v. Curtis Publishing Company, supra,* relied on the rule that in a case of a defamatory publication directed against a class, without in any way identifying any specific individual, no one individual member of the group has any redress. The District Judge held:

"Even assuming that the article is defamatory of Columbia taxicab drivers as a group, rather than generally of all taxicab drivers applying their trade in the City of Washington, no individual Columbia taxicab driver has a cause of action for libel."

182 F.2d at 378.

Again in *Service Parking Corp., supra,* the Court found no claim based on the law of group libel when 1 of 12 parking lot owners in downtown Washington brought suit against the Washington Times Company in regard to an article allegedly libeling all parking lot owners in downtown Washington. It would seem that a group of taxicab drivers or parking lot owners in Washington, D.C. or even the taxicab drivers for a specific company such as Columbia would be a smaller group than all the property owners of Dalecarlia Fairways Subdivision or all the residents of Lake Dalecarlia. Thus, if there can be no claim for the taxi drivers or the parking lot owners, there can be no claim for the plaintiffs in the case presently before the court.

The linchpin for all the plaintiffs' claims is the doctrine of group libel. None of plaintiffs' claims can survive without it. As noted above, such a basis for liability simply does not exist in Indiana. Because of the conceptual ingredients of group libel it is not a favored doctrine. All of the values of Article I, Section 9 of the Constitution of Indiana as well as those in Amendment I of the Constitution of the United States look the other way. It is not for this court sitting in a diversity case to implant such a doctrine into the substantive law of Indiana, when for 167 years the courts of Indiana have refused to recognize the doctrine of group libel. Thus, applying the principles enunciated in the *Arcand* decision, *supra,* it is clear that plaintiffs have no claim here.

The articles concern a large group, as many as 2000 individuals that live in the Lake Dalecarlia community. The articles do not have any special application to any particular person. The language regards such a large group that it does not give rise to any civil claim on the part of any individual. Further, the group is far too large to fall within the purview of the second principal of *Arcand.* Finally, there are no allegations that would have the language fall within the third principal as to the defamation of part of a group. Failing to come within the confines of any of the principles in regard to group libel, plaintiffs do not have a claim and defendant is entitled to a judgment as a matter of law.

## II.

Article I, Section 9 of the Constitution of Indiana provides:

Free speech and writing.—No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

The textual sweep of this provision is every bit as broad as the provisions regarding a free press in Amendment I of the Constitution of the United States. There is a fundamental interplay between the values that inhere in both constitutional provisions. *Taylor v. State,* Ind., 438 N.E.2d 275 (1982). The provisions in the Constitution of Indiana constitutes significant and relevant substantive law to be followed by this court as mandated by *Erie v. Tompkins.*

Article I, Section 9 has been read expansively by the Supreme Court of Indiana in a criminal context, *see State v. Kuebel*, 241 Ind. 268, 172 N.E.2d 45 (1961) (per Bobbitt, J.); by the Court of Appeals of Indiana in a civil context, *see Aafco Publications, Inc. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (1974) (per Staton, J.), *cert. den.*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976), and *Jacob Weinberg News Agency, Inc. v. City of Marion*, 163 Ind.App. 181, 322 N.E. 730 (1975); and by the Attorney General of Indiana. See opinions of Attorney General 1979, No. 79–29, p. 91. See also, *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211 (1978), and *Elliott v. Roach,* Ind.App., 409 N.E.2d 661 (1980). Aafco has pointedly direct application to this case. Part II of Judge Staton's majority opinion is well worth quoting at length:

> We first assume that the publication of matters which are of general or public concern is an activity protected by Article 1, Section 9 of the Indiana Constitution. Secondly, we assume that factual error is inevitable in the course of free debate and that some latitude for untrue or misleading expression must be accorded to the communications media; otherwise, free, robust debate worthy of constitutional protection would be deterred and self-censorship would be imposed in the face of unpopular controversy. We seek an accommodation between two societal interests: (1) freedom of speech and of the press as it relates to a well-informed community, and (2) protection of the private individual's reputation when it is involved in matters of general and public concern.
>
> Indiana's constitutional protection of freedom of expression requires that the interchange of ideas upon all matters of "general or public interest" be unimpaired. In order to fulfill its historic function, freedom of discussion "must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama* (1940), 310 U.S. 88, 102, 60 S.Ct.

736, 744, 84 L.Ed. 1093. Emerging principles of free expression "have disclosed the artificiality, in terms of the public's interest, of a simple distinction between 'public' and 'private' individuals or institutions." *Rosenbloom v. Metromedia, Inc., supra,* 403 U.S. at 41, 91 S.Ct. at 1818. Even the *New York Times* majority opinion placed primary emphasis on our "profound national commitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open." 376 U.S. at 270–271, 84 S.Ct. at 721 (emphasis added). Comments in other United States Supreme Court decisions reiterate the basic value judgment that constitutional guarantees of free speech and press must extend to all matters which affect our efforts to live and work together in a free society. (footnote omitted)

*Id.,* at 162 Ind.App. 678–79, 321 N.E.2d 585–86.

In other parts the opinion clearly demonstrates incorporation into the substantive law of Indiana the values announced by the Supreme Court of the United States in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The reasoning in *Aafco* resulted in the affirmation of a summary judgment granted in favor of the newspaper. In conclusion the majority in *Aafco* stated:

> The policy at the foundation of the *New York Times* privilege standard is the promotion of free expression. The publisher who maintains a standard of care designed to avoid knowing or reckless falsehood must be accorded sufficient assurance that those factual errors which nonetheless occur will not expose him to indeterminate liability. If a genuine issue of material fact concerning a publish-

er's reckless disregard for the truth could be raised by a mere showing that the published speech was factually incorrect, the constitutional policy of avoiding media self-censorship would be seriously eroded.

*Id.,* at 162 Ind.App. 688, 321 N.E.2d 591.

■ There are several salient and relevant teachings from *Aafco:*

1. The subject here was a matter of general public interest.

2. The plaintiffs here are not "public figures".

3. The articles in question did not in any way refer to or disparage the private reputations of the plaintiffs.

4. Here, unlike *Aafco* there was no direct reference to any plaintiff by name.

5. None of the published statements here are libel per se.[1]

### III.

■ Slander of title is defined under Indiana law as "a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, or of some right of his, causing him special damage." 18 I.L.E. Libel and Slander § 2, p. 450 (1959). Thus, to prevail in an action grounded on slander of title, a plaintiff must prove that the statements were made maliciously, that they were untrue, and that the plaintiff sustained pecuniary loss as a necessary and proximate result of the slanderous statements. *Harper v. Goodin,* Ind.App., 409 N.E.2d 1129 (1980). See also, *Freiburger v. Fry,* Ind. App., 439 N.E.2d 169 (1982); *Display Fixtures Co., etc. v. R.L. Hatcher, Inc.,* Ind. App., 438 N.E.2d 26 (1982); W. Krieger, "1982 Survey of Recent Developments in Indiana Law-Property," 16 Ind.L.Rev. 283, 312 (1983); R. Townsend, "1982 Survey of Recent Developments in Indiana Law-Secured Transactions and Creditors' Rights," 16 Ind.L.Rev. 315, 322 n. 57 (1983).

■ While damages are the normal remedy for slander of title, even where the suit is in equity, a counterclaim for slander of title fails to state grounds for damages, absent allegations that the suit was maliciously and wrongfully brought without probable cause and for the sole purpose of casting a cloud on the counterclaimant's title. *Pirchio v. Noecker,* 226 Ind. 622, 82 N.E.2d 838 (1949).

■ In this case, considering the allegations in a light most favorable to the plaintiffs, there is a total failure to allege that "title" or any similar interest of the plaintiffs' real estate was slandered by the defendant. In fact, there was no reference to *anyone* as the owner of any particular tract of land. To permit a claim for slander of title to stand under these allegations would be to extend that concept completely beyond its boundaries as established by the courts of Indiana. The basic teaching of *Erie* prevents this court from doing so.

### CONCLUSION

In reviewing the facts in this case and placing them within the principles of group libel, the conclusion must be drawn that there is no claim for libel and defendant is entitled to summary judgment. The 165 owners of property in Dalecarlia Fairways Subdivision or the 2000 residents of Lake Dalecarlia comprise groups large enough wherein a defamation of that group gives rise to no civil action on the part of any individual member of the group unless he can show special application of the defamatory matter. In reviewing the complaint, plaintiffs' answers to interrogatories and the articles involved herein, there is no special application to any of the plaintiffs.

Further, this is not a situation where the defamatory statement is in regard to all members of a small group. As seen in the cases these groups have been held to 25 or less to sustain an action. The smallest

---

1. For a general treatment of the law of libel *per se* vis-a-vis libel *per quod* in Indiana, see 18 I.L.E. Libel and Slander § 11, nn 4, 5, and §§ 21–26, and cases collected thereat. For a recent treatment of libel law in general, see M. Gross, "Libel Law—Past and Present," Case & Comment (May-June, 1983), pp. 25 *et seq.*

group involved here is the 165 landowners in Lake Dalecarlia Fairways Subdivision; the articles do not refer to that group. The articles are referring to the entire community of Lake Dalecarlia which is a group of at least 2000 individuals. This group in no means falls within the second principle of libel which would recognize a cause of action and obviously, the third principle as seen in *Arcand* is not applicable. This is not a situation where it has been asserted that a part of a group has partaken in any particular action or that all but part of a group has taken any type of action that would cause reflection on all of them.

In reviewing the principles of group libel and the requirement that the defamatory material must refer to an ascertainable person and that person must be the plaintiff, the plaintiffs cannot sustain any claim for libel. As there are no genuine issues as to any material facts and the law supports the defendant, defendant's Motion for Summary Judgment should be, and hereby is, GRANTED. Because this ruling renders moot the plaintiffs' request for class certification under F.R.Civ.P. 23, no further treatment of that issue is necessary here. Each party will bear its own costs. SO ORDERED.

APPENDIX A

*Opinions in this column are those of The Times*
*Other views on this page are independent*

# THE TIMES

Published Daily except Saturday: 417 Fayette St., Hammond, Ind.
Walter J. McCarthy, Publisher
William F. Chapman, Executive Editor

# *Real trouble in paradise*

. No more rumors. No more gossip. No more speculation. No more delusions. The trouble in paradise is real.

The hushed, unsettling anxiety that gnawed away at the peace of mind of Lake Dalecarlia's otherwise happy and serene residents was a suspicion — a suspicion that the high incidence of cancer in their Eden was more than just bad luck or coincidence.

That awful suspicion, it turns out, was more than justified. The Times' exhaustive, months-long investigation reported today for the first time anywhere, reveals that the community itself — not just some people who live there — has the cancer. No other diagnosis is possible.

But why wasn't the diagnosis made sooner? Why wasn't the link between chemical waste and human waste that causes the cancer made before now? Why did a newspaper do a job that should have been done by government?

The answer is *inertia*. Inertia on the part of the residents. Inertia on the part of government. Inertia at every level of responsibility.

"It's not our job." "Let the other guy do it." "Not enough money." All these rationalizations and more were trotted out by various people and agencies that could have investigated and done something but didn't.

Inevitably, comparisons will be made between Lake Dale's health and cancer hazards and those that exist at Love Canal in New York State. Whatever similarities are found in the nature of the illnesses that plague both communities, the cause of their troubles are sharply dissimilar.

Industry caused the fatal carcinogenic mix at Love Canal. At Lake Dale it was self-induced. Yes, government — local, state and federal — might have done more, should have done more; but when it didn't, Lake Dale residents persisted in their unsanitary ways, fearing the worst and hoping for the best. For them there are no scapegoats. They brought it on themselves.

What should be done now? Lake Dale residents will have to decide for themselves whether they want to leave or remain in their ailing paradise. If we lived there, we would leave. Period. At least until the environment is made safe.

Making the environment safe is government's job. There should be no more excuses. No more delays. No more money shortages. The time for buck-passing is over. It's time to set things right in paradise.

842

# Lake Dale— A correction...

An editorial of May 23 concerning The Times' findings of an unusually high rate of cancer at Lake Dalecarlia has given some of our readers the wrong impression and we'd like to correct and clarify our position.

We asked, "...why wasn't the link between chemical waste and human waste that causes the cancer made before now?" Although we believe there may be such a link, we were mistaken to have framed the question as though it were a scientific fact. The scientific cause of Lake Dale's high cancer rate has yet to be determined.

We stand by our statement that the research The Times did should have been done by the government, and not this newspaper.

We also wrote then that "...government — local, state and federal — might have done more, should have done more; but when it didn't, Lake Dale residents persisted in their unsanitary ways, fearing the worst and hoping for the best."

Some readers inferred — incorrectly — that we were saying Lake Dale residents were unsanitary. Of course, that's not correct. We thought it was apparent from the context of the whole article that we were writing only about residents with septic tank problems.

Even in that context, we were only referring to some residents. Moreover, we should have made it clear that even in those cases, the homeowners — to the extent they may have contributed to an unsanitary environment — did so unknowingly and unwittingly.

We also regret suggesting that the community itself has cancer and that the residents should leave the area for their own safety.

In retrospect, we believe they should stay there and work to find and correct whatever it is in their environment that may be causing the unusually high rate of cancer. As Times executives explained to a group of Lake Dale residents at a private meeting several weeks ago, it has always been The Times' policy to help them in this endeavor.

We will continue to prod local, state and federal authorities to cooperate with Lake Dale residents in researching and correcting the cause or causes of the cancer. And we hope that Lake Dale residents will cooperate with us to that end so the community can be a better place to live.

We stated at the outset of the May 23 editorial that some people in Lake Dale suspected "...that the high incidence of cancer in their Eden was more than just bad luck or coincidence."

We concluded that "Making the environment safe is the government's job. There should be no more excuses. No more delays. No more money shortages. The time for buck-passing is over. It's time to set things right in paradise."

Those were the main points of our editorial, and we stand by them. It was never our intention to embarrass anyone or bring additional hardship to Lake Dale residents.

Our objective has been and will remain the same as theirs: to rid their community of whatever it is that accounts for those high cancer statistics.

THE TIMES    Exhibit 2
July 18, 1982    Page -2-

## Correction

In an article about Lake Dalecarlia published May 25 The Times incorrectly said: "The community's high cancer rate has been linked to possible groundwater contamination, apparently the result of ineffective septic tank sewage treatment."

As The Times has said in other articles and should have said in the article of May 25, the community's high cancer rate may be linked to possible groundwater contamination, possibly the result of ineffective septic tank sewage treatment.

The cause of the high cancer rate is not known. Federal, state and county officials are continuing to investigate.

The Times regrets the error.